## STATE v. McKINNISH

[110 N.C. App. 241 (1993)]

### III.

---

STATE OF NORTH CAROLINA v. TERRY KEITH McKINNISH

No. 9227SC377

(Filed 18 May 1993)

1. **Evidence and Witnesses §§ 2616, 2617 (NCI4th)— letters to wife—threats and promises—not privileged communications**

    Two letters defendant wrote to his wife after they separated asking her to support his alibi concerning the time they left their apartment to travel to West Virginia on the day of the crimes with which defendant was charged were not privileged communications because both letters show that defendant was not relying on the affection, confidence and loyalty of the marital relationship where one letter contained threats that the wife would serve time if defendant served time, and both letters offered a material reward to the wife if she would support his alibi.

    **Am Jur 2d, Witnesses §§ 296 et seq.**

STATE v. McKINNISH

[110 N.C. App. 241 (1993)]

Effect, on competency to testify against spouse or on marital communication privilege, of separation or other marital instability short of absolute divorce. 98 ALR3d 1285.

2. **Evidence and Witnesses § 2931 (NCI4th)— defendant's estranged wife—not hostile witness**

In a prosecution for rape, robbery, kidnapping and other crimes against a woman who lived in the same apartment complex as defendant, the trial court did not err by failing to declare defendant's estranged wife a hostile witness on the ground that she "sabotaged" his alibi defense by changing her story as to when she and defendant left their apartment for West Virginia on the day of the crimes where the wife testified that she and defendant left "before two-thirty," her testimony did not conflict with her statements to defense counsel that they left around 1:00 p.m., and her testimony in fact tended to support defendant's alibi because the victim testified that her attacker knocked on her door between 2:25 and 2:40 p.m. and remained in her apartment for fifteen minutes.

Am Jur 2d, Witnesses §§ 245-247.

Effect, on competency to testify against spouse or on marital communication privilege, of separation or other marital instability short of absolute divorce. 98 ALR3d 1285.

Appeal by defendant from judgments entered 24 October 1991 by Judge Julia V. Jones in Lincoln County Superior Court. Heard in the Court of Appeals 2 April 1993.

Defendant was indicted and convicted of robbery with a dangerous weapon, assault with a deadly weapon with intent to kill inflicting serious injury, first degree rape, first degree kidnapping and felonious breaking and entering. Defendant was sentenced to terms of imprisonment totalling life plus eighty years.

A detailed recitation of the facts underlying defendant's convictions is not necessary here. It is sufficient to note that Ms. Tina Paige testified that she answered a knock at her front door at approximately 2:25 or 2:30 p.m. on 29 July 1990. When she opened the door, she saw the defendant. The defendant forcibly entered her home, led Ms. Paige from room to room, raped her, stabbed her and cut her. At the time of the attack Ms. Paige was living in an apartment or duplex in Iron Station, North Carolina.

Ronnie Matthews, a detective with the Lincoln County Sheriff's Department, testified that he met with the defendant on 29 December 1990. The defendant told Det. Matthews that on the morning of 29 July 1990 he and Mary Ellen Stanley, defendant's wife, (the two had been married in September 1990) left for West Virginia to visit Ms. Stanley's mother. Det. Matthews then traveled to War, West Virginia where he interviewed Ms. Stanley.

In her statement to Det. Matthews, Ms. Stanley said that a little before 2:00 p.m. on 29 July 1990 she went into her bathroom to take a shower. She stayed in the bathroom about 25 minutes. Thereafter, she and the defendant left for West Virginia. The couple arrived in West Virginia about 6:00 or 6:30 p.m. Det. Matthews testified that "there was a discrepancy in the time that he had left to go to West Virginia and the time that Mary Ellen had told me they left would put them at the apartment at the time of the crime." At the time of the attack the defendant and Ms. Stanley were living together in the same apartment or duplex complex as Ms. Paige.

Det. Matthews interviewed the defendant again on the morning of 31 December 1990. Det. Matthews told the defendant of the time discrepancy, and the defendant gave Det. Matthews a statement. Defendant claimed that on the day in question he engaged in consensual intercourse with Ms. Paige. He then returned to his apartment. After about ten minutes Ms. Stanley came out of the bathroom. The couple waited for Ms. Stanley's hair to dry, ate and left for West Virginia. They arrived in West Virginia about 1:30 p.m.

The State did not call Ms. Stanley as a witness but after the State rested, the defendant called Ms. Stanley as a witness. When asked when she and the defendant left for West Virginia, Ms. Stanley testified, "I'd say it was before two-thirty, but I'm not for sure what time." Ms. Stanley did not remember when the couple arrived in West Virginia. The defendant and Ms. Stanley separated in November 1990, and Ms. Stanley has been seeking an annulment since December 1990.

On cross-examination Ms. Stanley testified that she received two letters from the defendant after they separated. In the letters the defendant requested that Ms. Stanley tell the police that she and the defendant left for West Virginia during the morning of 29 July 1990. One of defendant's letters, exhibit 28, read as follows:

STATE v. McKINNISH

[110 N.C. App. 241 (1993)]

Dear Mary,

Hello Sweetheart!

Just a few lines to let you know that I am thinking about you and the kids.

I am doing fine up here just in jail waiting on to go to court over this bull shit.

Mary, why did you tell the dective we left at 2:00 oclock that sunday morning?

You know that . . . told them up here at the jail when me, your mom, Dad came up here that we left at 10:30 or 11:00 oclock that sunday morning. Any way they are trying to give me 2 life sentences in prison over this, your the only one that can save me from spending the rest of my life in prison. Any way your in . . . as I am so we can walk away from this or spend time in prison its up to you mary, Because if I spend time, you will too. Anyway, you have been supenna to court. Mary, ill do anything in this world for you if you will help me. I talked to mom yesterday, we will pay off the bronco and everything else if you will help me.

I am sorry for messing up your life mary. I realy do love you with all of my heart. and i will always will. Please call Mom collect if you are willing to help me, she said she will except the call ok. If you ever do anything else for me, just help me out ok.

Well J.P. stevens was going to hire me as a fixer untill they arrested me on new years day.

We was together when all of this happend mary so stick By the story ok.

So make sure you say that we left at 10:30 or 11:00 sunday morning.

Ever since we split up mary all I had is bad luck. I would love to try and work things out between us if you are interested mary if not, I guess we won't ok. Its up to you honey. Well I better go for now ok. So call mom she is expecting

a phone call from you ok. Please don't write me while I am in jail ok. Well better go for now.

Rember I love you for Ever.

Terry.

The other letter, exhibit 26, reads as follows:

Dear Mary,                  Tuesday 13th

Hello Sweethart!

Just a few lines to see how you are doing! I am doing alright I guess, just sitting here in jail waiting on trial.

Lesson Mary, Granny said she talked to you on the phone and you told her that we left that sunday morning at 10:30 or 11:00 am sunday morning.

Well I am fixing to go to prison for the rest of my life if you dont get down here and tell my lawyer that we did leave at 10:30 or 11:00 am that sunday morning and I only left your sight for 5 minuts and that was to sweep out the Bronco because we thought that we lost it that monday morning when we took it back at McArms. ok. Mom said she will pay for your gas to and from W. Virginia ok. She wants you to call her Mary so please do so, My life is on the line here and ill do anything in this world to pay back you and [illegible] for it ok. You can call her collect she said.

Well I let my beard grow out now so thats really about it. By the way mary if you come down you can pick up those Reebocks you said you want back ok. there over moms.

Well honey I better close for now its getting late so take care of yourself and give the kids my love ok. i hope to here from you soon.

Love Forever

Terry

P.S. Call mom collect as soon as possible ok. "Love you Mary".

From judgment on the verdicts, defendant appeals.

STATE v. McKINNISH

[110 N.C. App. 241 (1993)]

*Attorney General Lacy H. Thornburg, by Assistant Attorney General D. Sigsbee Miller, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Mark D. Montgomery, for the defendant.*

EAGLES, Judge.

I

[1] Defendant first argues that the trial court erred by "allowing [Ms. Stanley] to testify to the contents of letters she received from defendant, and in admitting those letters into evidence." Defendant argues the letters are privileged confidential marital communications. We disagree.

In *State v. Freeman*, 302 N.C. 591, 598, 276 S.E.2d 450, 454 (1981) our Supreme Court held that in order for a communication to be a confidential communication it must be "induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship."

Defendant contends that the letters were "made in reliance on the sanctity of the marital relationship[, and that it] is apparent from the language of the letters that defendant was relying on what he thought would be Ms. [Stanley's] spousal loyalty." The State contends, however, that the letters were not confidential communications because they contained threats and attempted to get Ms. Stanley to misrepresent the time of her departure on the trip to West Virginia. We agree with the State.

In *Freeman v. St. Paul Fire and Marine Ins. Co.*, 72 N.C. App. 292, 324 S.E.2d 307, *disc. review denied*, 313 N.C. 599, 330 S.E.2d 609 (1985), our Court held that a threat communicated by one spouse to another is not a privileged confidential communication. Here, exhibit 28 contains the following statements:

Any way your in . . . as I am so we can walk away from this or spend time in prison its up to you mary, Because if I spend time, you will too.

We was together when all of this happened mary so stick By the story ok.

So make sure you say that we left at 10:30 or 11:00 sunday morning.

STATE v. McKINNISH

[110 N.C. App. 241 (1993)]

Clearly, these statements constitute unprivileged threats. Accordingly, it was permissible for the court to allow the State to cross-examine Ms. Stanley concerning exhibit 28 and admit it into evidence.

Moreover, both letters show on their face that they were not "induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship." *Freeman*, 302 N.C. at 598, 276 S.E.2d at 454. In both letters defendant instructed Ms. Stanley to say that she left at 10:30 or 11:00 a.m. on the day in question and offered her material reward in return for her help. Exhibit 28 contains the following statements:

Mary, ill do anything in this world for you if you will help me. I talked to mom yesterday, we will pay off the bronco and everything else if you will help me.

So make sure you say that we left at 10:30 or 11:00 sunday morning.

Exhibit 26 contains the following statements:

Well I am fixing to go to prison for the rest of my life if you dont get down here and tell my lawyer that we did leave at 10:30 or 11:00 am that sunday morning and I only left your sight for five minutes and that was to sweep out the Bronco because we thought that we lost it that monday morning when we took it back at McArms. ok. Mom said she will pay for your gas to and from W. Virginia ok. She wants you to call her Mary so please do so, My life is on the line here and ill do anything in this world to pay back you and [illegible] for it ok. You can call collect she said.

By the way mary if you come down you can pick up those Reebocks you said you want back ok. there over moms.

Both letters reflect that defendant was unable to rely on the affection, confidence and loyalty engendered by his marital relationship. Rather, the defendant relied on his offering of material reward in order to attempt to persuade Ms. Stanley to testify in his favor. Accordingly, we agree that the exhibits are not privileged and are admissible on this basis as well.

II

[2] Defendant next argues that the trial court erred by failing to declare Ms. Stanley an adverse witness. "The decision whether to declare a witness hostile or adverse rests within the trial court's sound discretion and will not be reversed absent a showing of abuse." *State v. Duvall*, 50 N.C. App. 684, 699, 275 S.E.2d 842, 854, *rev'd on other grounds*, 304 N.C. 557, 284 S.E.2d 495 (1981). Here, we find no abuse of discretion.

Defendant argues that Ms. Stanley was an adverse witness because she had separated from the defendant and "sabotaged the defendant's alibi defense" by changing her story as to when she and the defendant left for West Virginia.

Ms. Stanley did testify that she began the process of having her marriage annulled in December of 1990. However, it does not appear that Ms. Stanley "sabotaged" the defendant's alibi defense.

The victim, Ms. Paige, testified that she returned to her apartment between 1:30 and 1:45 p.m. on the day in question. She changed her son's clothes, put him down for a nap, changed her own clothes, fixed herself a bowl of ice cream and sat down on the couch. Ms. Paige had been home for approximately fifteen minutes when she fixed the ice cream. About 2:15 p.m. Ms. Paige received a phone call from her sister. She talked to her for a short while and then sat back down on the couch. About five minutes later the defendant knocked on her door. She testified on direct examination that the defendant knocked on her door at approximately 2:25 or 2:30 p.m. On cross-examination, Ms. Paige admitted telling Det. Matthews that the defendant knocked on her door at 2:40 p.m. The attack lasted approximately fifteen minutes.

Ms. Stanley testified on direct examination that although she was not certain what time she and the defendant left for West Virginia she would "say it was before two-thirty. . . ." At that point a *voir dire* was conducted. During her *voir dire* testimony Ms. Stanley admitted that she told defense counsel on numerous occasions that she and the defendant left for West Virginia around 1:00 p.m. She testified, "It was something around through there. I'm not for sure about the time, though." Ms. Stanley also admitted that she told defense counsel that she "believed it was about twelve or after twelve[ ]" when they left. Upon resumption of direct ex-

amination, Ms. Stanley testified that she and the defendant left "before two-thirty."

We first note that contrary to defendant's assertion, Ms. Stanley's testimony on direct examination is not necessarily in conflict with what she told defense counsel prior to trial. Ms. Stanley twice testified that she and the defendant left for West Virginia "before two-thirty". She did not testify that they did not leave prior to that time. Rather, her testimony is merely that she left "before two-thirty."

Second, we note that Ms. Stanley's testimony is not necessarily in conflict with her statement to Det. Matthews. Her statement does not indicate exactly what time they left for West Virginia. Ms. Stanley told Det. Matthews that she took a shower a little before 2:00 p.m., and that she stayed in the bathroom about twenty-five minutes. The couple arrived in West Virginia at about 6:00 or 6:30 p.m.

Moreover, even assuming *arguendo*, that Ms. Stanley's testimony did conflict, when her testimony is read together with Ms. Paige's testimony it is clear that the defendant's alibi defense was not "sabotaged." Ms. Paige testified that her attacker knocked on her door between 2:25 and 2:40 p.m., and that he remained in her home for approximately 15 minutes. Ms. Stanley testified that she and the defendant left for West Virginia before 2:30 p.m. Accordingly, Ms. Stanley's testimony in fact tends to support an alibi defense. That defense was rejected by the jury when it found the defendant guilty of the crimes charged.

We hold that based on the record before us, the trial court has not abused its discretion by failing to declare Ms. Stanley an adverse witness.

### III

Defendant has abandoned his remaining assignments by failure to bring them forward in his brief. N.C.R. App. Pro. 28(b)(5).

No error.

Judges MARTIN and JOHN concur.